IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
GREENBELT DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 24-11815-MCR |
| | ) | (Chapter 11) |
| 903 LAKE FRONT DRIVE, LLC | ) | |
| | ) | |
| Debtor. | ) | |

**OBJECTION TO CONFIRMATION OF AMENDED**
**CHAPTER 11 PLAN OF REORGANIZATION OF 903 LAKE FRONT DRIVE, LLC**

Comes now WCP Fund I LLC as servicer for Pacific RBLF Funding Trust ("WCP"), by and through undersigned counsel, pursuant to Federal Rule of Bankruptcy Procedure 3020(b), and objects to confirmation of the Amended Chapter 11 Plan of Reorganization of 903 Lake Front Drive, LLC (the "Plan," as found at DE #57, with the proponent thereof being known as the "Debtor") and in support thereof states as follows:

## I. Introduction

The Debtor proposes to sell its eponymous asset to the highest bidder at an auction, but does not specify (i) where the auction will be held; (ii) when the auction will be held; (iii) how notice of the auction will be given; (iv) the minimum bid to be accepted at the auction; or (v) the deposit requisite to bid at the auction. The Plan also does not provide any mechanism to pay U.S. Trustee fees. Nor does the Plan satisfy the so-called "liquidation test." And these are just three of the at least six separate issues that militate against confirmation of the Plan.

At bottom, this case is the story of a Debtor that actively covenanted to not allow the property located at 903 Lake Front Drive, Bowie, Maryland 20721 (the "Property") to be inhabited by any person, for any reason, until such a time as the Debtor's obligation to WCP was repaid. By all accounts, the Debtor has openly and willfully disregarded that covenant, moving a principal's

family member into the Property—rent free—and then petitioning for chapter 11 relief after defaulting on the underlying indebtedness. When the exclusivity period in this case ran, and WCP filed its own plan of reorganization, the Debtor seemingly panicked and elected to roughly mimic WCP's plan with a flurry of edits aimed at ensuring the interests of equity are protected over and above those of the Debtor.

The rough mimicking of WCP's plan, however, has invited a slew of issues. Since the Debtor did not start with its own draft, and did not construct a document from scratch or even a familiar template, the end result is less a cogent plan and more a jagged effort at penetrating a square hole with a round peg. Portions of the Plan, very genuinely, do not make sense. Certain key mandates of Title 11 of the United States Code (the "Bankruptcy Code") are neglected in the Plan. And the end result is a document that, no matter its ultimate juxtaposition to WCP's plan, is legally incapable of being confirmed.

## II. Standard

Familiarly, a bankruptcy court is only to confirm a plan of reorganization if all of the requirements set forth in Section 1129(a) of the Bankruptcy Code are satisfied. 11 U.S.C. § 1129(a). In assessing such compliance, "[t]he plan proponent bears the burden of establishing that each requirement set forth in §1129 has been met by a preponderance of the evidence." *In re Neogenix Oncology, Inc.*, 508 B.R. 345, 353 n.9 (Bankr. D. Md. 2014) (citing *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993)).

Accordingly, confirmation of a plan in a non-Subchapter V case is always pegged to a plan proponent making showings that (i) the plan is compliant with Title 11 of the United States Code (the "Bankruptcy Code"), 11 U.S.C. § 1129(a)(1); (ii) the plan's proponent is compliant with the Bankruptcy Code, 11 U.S.C. § 1129(a)(2); (iii) "[t]he plan has been proposed in good faith and

not by any means forbidden by law," 11 U.S.C. § 1129(a)(3); (iv) professional fees correlative to the case's administrative are to be subject to judicial approval, 11 U.S.C. § 1129(a)(4); (v) the plan proponent has disclosed its forward-looking officers and directors, with such being generally consistent with the interests of creditors and equity holders, 11 U.S.C. § 1129(a)(5); (vi) the plan not provide for the imposition of rates at odds with governmental oversight, 11 U.S.C. § 1129(a)(6); (vii) each impaired class has either accepted the plan or will take as much under the plan as it would in a chapter 7 liquidation, 11 U.S.C. § 1129(a)(7); (viii) each class has either accepted the plan, is not impaired under the plan, or may be "crammed down" by virtue of the plan being fair and equitable, 11 U.S.C. § 1129(a)(8); 11 U.S.C. § 1129(b); (ix) taxes due to governmental units will be paid within five years of the petition date, 11 U.S.C. § 1129(a)(9); (x) at least one impaired class has voted to accept the plan, 11 U.S.C. § 1129(a)(10); (xi) confirmation is not likely to be followed by liquidation, 11 U.S.C. § 1129(a)(11); (xii) filing fees and US Trustee fees are to be paid on or before the plan's effective date, 11 U.S.C. § 1129(a)(12); (xiii) retirement benefits are not diminished by the plan, 11 U.S.C. § 1129(a)(13); (xiv) the plan provide for payment of domestic support obligations, 11 U.S.C. § 1129(a)(14); and (xv) property transfers be in accord with applicable nonbankruptcy law, 11 U.S.C. § 1129(a)(16).

## III. Argument: Confirmation Should be Denied

### a. The Plan Does Not Comply with the Bankruptcy Code

#### i. The Plan Does Not Satisfy the Rigors of Section 1123

As a starting point, the Plan ought not be confirmed insofar as the Plan, even when most generously construed, does not nearly abide by the mandates of the Bankruptcy Code provision specifying what must be included in such a document. Section 1129(a)(1) requires a plan of reorganization to comply with the applicable provisions of the Bankruptcy Code yet, here, the Plan

most certainly does not do so, glossing over several key mandates set forth in the very code section that outlines the compulsory contents of a reorganizational filing.

Indeed, a plan must, *inter alia*, "specify the treatment of any class of claims or interests that is impaired under the plan. . ." 11 U.S.C. § 1123(a)(3). Yet WCP, quite genuinely, has no clue how its claim is actually being treated by the Debtor. And this is of some import since WCP is not merely one of only two creditors in this case but, by a rather wide margin, also the holder of the largest single claim.

The Plan provides that WCP has an allowed secured claim, as of the petition date, in the amount of $660,122.04. *See* Plan, DE #57, at § 3.02(a). The Plan also provides that there is to be an auction of some variety. *Id.* at § 4.1.2. And while the Plan defines the word "Auction" as having "the definition set forth in Section 4.1.1," *id.* at § 1.2(c), no such definition is actually afforded in that section or anywhere else, *id.* at § 4.1.1, *passim*. So the Plan says there is to be an auction, and even provides for how closing shall occur after the auction, but never specifies what exactly shall constitute the auction, when the auction is to be held, how one is to bid at the auction, or how the auction shall be noticed.

Conversely, and seemingly to the mutual exclusion of the foregoing auction, the Plan also provides that ". . . the Debtor shall make regular mortgage payments and payments toward arrears to satisfy any outstanding obligations to secured and priority creditors over a period of 60 months." *Id.* at § 4.1.1. Yet, again, there is a wholesale lack of important information here. The Plan does not specify the interest rate to be paid to secured creditors. The Plan does not specify the amortization schedule upon which loan payments will be calculated (which is particularly meaningful since the debt held by WCP is fully matured—there are no "regular" payments to be made thereunder). The Plan does not specify how the Property will be cared for in the interim. The

Plan does not specify if the Property is insured or will remain insured. The Plan does not specify how or when post-confirmation taxes will be paid.

Lest those latter few points appear academic, they go to a larger issue: the Plan does not create any dynamic whatsoever, other than the aforesaid auction, for the Debtor to make any money. Yet the Debtor will need funds to make payments to creditors. The Debtor will need funds to pay insurance premiums. The Debtor will need funds to pay post-confirmation taxes. The Debtor will need funds to provide for the maintenance and upkeep of the Property. And, absent collecting rent (something that is very clearly *not* provided for in the Plan), it is rather genuinely unclear how a single asset real estate entity could possibly procure funds with which to operate.

This does, too, speak to another failure under Section 1123: The Plan does not provide adequate means for implementation. 11 U.S.C. § 1123(a)(5). Since there is no mechanism for the Debtor to raise any monies, there is no mechanism for the Debtor to actually fund the Plan or care for the Property during the life of the Plan. Creditors are entitled to know how funds will be raised and from where those funds will emanate, yet the Plan provides no such specifications.

**ii. The Plan Does Provide a Means of Paying U.S. Trustee Fees**

The lack of funds also invites a related issue: it is unclear how the Debtor will pay U.S. Trustee fees. Such is a condition precedent to confirmation, 11 U.S.C. § 1129(a)(12), yet, as noted *passim*, the Plan does not actually provide any mechanism through which the Debtor can obtain any money whatsoever. The Debtor is putatively a business but is not actually engaged in any business activities, instead permitting an equity holder (or, as it seems to be, the relative of an equity holder) to utilize the Debtor's sole asset, *gratis*, to the exclusion of all others.

**b. The Debtor is Not in Compliance with the Bankruptcy Code**

In addition to the Plan needing to comply with the Bankruptcy Code, 11 U.S.C. § 1129(a)(1), the proponent thereof must, too, be in compliance with the Bankruptcy Code, 11 U.S.C. § 1129(a)(2). Yet the Debtor, quite plainly, is not in compliance with the dictates of the Bankruptcy Code.

As of the filing of this objection, the Debtor has not filed a monthly operating report for November 2024 or December 2024, despite both such documents having now come due. 28 CFR § 58.8(e). This creates a necessary information gap that, in turn, inhibits the ability of creditors to assess the feasibility of the Plan. As noted *infra*, there are very real concerns—pegged to the October 2024 operating report—about the Debtor having accrued significant administrative expenses that are not provided for under the Plan. Yet without these final two months of pre-confirmation reports, it is impossible to assess how those obligations have grown or shrunk, whether the Debtor has realized any revenues, or just what other issues may be afoot.

**c. The Plan Does Not Provide for the Payment of Administrative Claims**

For the Plan to be confirmed, all administrative claim holders must be compensated, in full, on or before the effective date. Here, however, the record reflects hefty administrative obligations to be owed by the Debtor but the Plan does not account for how they can possibly be paid. Since the Plan does not furnish any funding mechanism at all, there are no means for these obligations to be timely satisfied.

Aside from monies owed to the Debtor's counsel, administrative obligations would include most post-petition obligations incurred by the Debtor. 11 U.S.C. § 503(b). Since the two most recent monthly operating reports have not been filed, there is some lack of clarity as to the scope and extent of those obligations. The last such report to be filed, however, points to no less than

$61,991.00 in postpetition payables exclusive of tax obligations. *See* October Monthly Operating Report, DE #64, at § 2(f). The whole of such postpetition non-tax payables were past due at the time of filing the report. *Id.* at § 2(g). And this is in *addition* to the $59,973.00 in postpetition taxes that have been incurred and remain unpaid. *Id.* at § 2(h-i).

The Plan provides for an effective date fourteen days after the entry of a confirmation order. Plan, DE #57, at § 1.2(s). The whole of these postpetition obligations—in addition to any allowed legal fees owing to the Debtor's counsel—will need to be paid on or before the effective date. 11 U.S.C. § 1129(a)(9). Yet since the Plan does not furnish any suggestion of how the Debtor is going to go about raising monies, and does not provide for the operation of any business or the conduct of any business activities, the Plan cannot be understood to properly provide for satisfaction of this core obligation.

**d. A Portion of the Plan is Forbidden by Law**

One of the odder—and more concerning—aspects of this case has been the Debtor's apparent desire to convey its eponymous asset, in part or whole, to an equity holder, for no consideration whatsoever. As addressed in previous briefing, this represents a blatant effort to favor the interests of equity over those of creditors, calls into question the calibration of the Debtor's fiduciary compass, and ultimately goes so far as to invite scrutiny of whether or not the Debtor actually understands there to be a integral legal difference between the entity and the person(s) who own that entity. Unfortunately, the Plan endeavors to advance this forbade scheme.

The Plan provides, *inter alia*, "[t]he property shall be deeded in the name of 903 Lake Front LLC and Marteese Green." Plan, DE #57, at § 4.1.3.

Martreese Green ("Designee Green") is the Debtor designee in this case, having signed the petition for relief. *See* Voluntary Petition for Non-Individuals Filing for Bankruptcy, DE #1, at §

17, p. 5. Designee Green also signed the most recent monthly operating report. *See* October Monthly Operating Report, DE #64, at p. 9.[1] And Designee Green did, too, execute the deed of trust, in favor of WCP, in which the Debtor covenanted, *inter alia*, "[u]nless otherwise agreed to in writing by the Beneficiary, Grantor shall not allow any person or persons to occupy the Mortgaged Property during the term of the Note." *See* Deed of Trust, attached hereto as Exhibit A, at § 5.3.

Yet the Property is not currently titled in the name of Designee Green—the Property is solely titled in the Debtor's name. So what the Plan proposes, through re-deeding, is to convey some portion of the Property, on a *gratis* basis, to Designee Green, without first paying creditors who have a lien on the Property.

Such a mechanism is plainly forbade by law. Conveying a property interest to an insider, without any consideration whatsoever (much less reasonably equivalent consideration), would constitute the undertaking of a fraudulent conveyance under the dictates of both the Bankruptcy Code and Maryland law. 11 U.S.C. § 548; Md. Code, Com. Law § 15-204; Md. Code, Com. Law § 15-205. There is no question but that the Debtor is insolvent. There is no question but that a *gratis* conveyance is devoid of reasonably equivalent consideration. And there is no question but that Designee Green is an insider of the Debtor. What is being proposed is a textbook fraudulent conveyance and, thusly, denotes the Plan being proposed in a manner that is "forbidden by law." 11 U.S.C. § 1129(a)(3).

Equally concerningly, the Debtor has shared—in an admirably open and candid manner—why it is that Designee Green is to be gifted an interest in the Property: so Designee Green may

[1] Strangely, the operating report is also signed by the Debtor's counsel, in his capacity as the "Responsible Party." *See* October Monthly Operating Report, DE #64, at p. 1.

then seek chapter 13 relief. *See* Disclosure Statement for Chapter 11 Plan of Reorganization of 903 Lake Front Drive, LLC, DE #37, at § I, p. 3 ("Debtor proposes that Guarantor be added to the deed and further proposes that this case be convert to a Chapter 13 case under the Bankruptcy Code.").

To be sure, fraudulently conveying an asset to an insider, so that insider may then stifle whatever rights creditors are afforded under a plan of reorganization by creating a new chapter 13 case is not a good faith route to reorganization. This is, rather, an open effort to use the forbade mechanism of a fraudulent conveyance to further frustrate creditors and keep the Property at bay.

**e. The Plan is Likely to be Followed by Further Reorganization**

Knowing that the Debtor intends to have its principal seek chapter 13 protection also casts light upon another barrier to confirmation: the Plan is not feasible. As observed *passim*, there is no funding mechanism—at all—in the Plan, and the Debtor has apparently amassed more than $61,000.00 in non-tax debts, and at least another $59,000.00 in tax debts, during the pendency of this case. The Debtor has also acknowledged, in open court, that the Property is of a value that is now less than what is due and owing to WCP on account of interest and fees having continued to accrue during the pendency of this chapter 11 proceeding. In light of these realities, it cannot be suggested, with any genuine sincerity, that the Plan is feasible.

Confirmation must be predicated upon a finding that, *inter alia*, such "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11).

To the Debtor's credit, the disclosure statement openly acknowledges that Designee Green will seek chapter 13 protection once joined on the deed to the Property. Yet such is not actually

"proposed in the plan." To the contrary, this acknowledgement is contained only in the disclosure statement and thusly does not satisfy the rigors of Section 1129(a)(11).

More macroscopically, however, the desire to undertake further reorganization simply casts light upon the impossibility of what is being proposed: the Property is already underwater. The obligation to WCP, secured by a lien on the Property, is only growing with each day. There is no income stream that will help the Debtor accrue new monies or revenues. And there is accordingly something of an impossibility to the Plan: the Debtor cannot actually pay the obligations thereunder. The Plan is, at core, not feasible. And such is a *per se* impediment to confirmation.

**f. The Plan Does Not Satisfy the Liquidation Test**

Using the Debtor's own valuation, the Property—if sold imminently through a chapter 7 liquidation—would fetch $654,700.00. Assuming WCP consented to such a sale and agreed to carve out the full amount of a trustee's commission, such commission would be $35,985.00. 11 U.S.C. § 326(a). The claim of Prince George's County would, too, need to be paid from such sale proceeds, before monies could flow to WCP, and that claim is in the amount of $8,205.83. *See* Claims Register #1. So WCP would receive a net distribution of $610,509.17.

In order for the Plan to be confirmed, the Debtor must show that WCP ". . . will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7." 11 U.S.C. § 1129(a)(7)(A(ii).[2]

[2] Alternatively, the Debtor could show that WCP "has accepted the plan. . ." 11 U.S.C. § 1129(a)(7)(A)(i). As is likely evident from this objection, WCP has not done so.

As noted by a leading treatise, the liquidation test set forth in Section 1129(a)(7) is "one of the cornerstones of chapter 11 practice. It is an individual guaranty to each creditor or interest holder that it will receive at least as much in reorganization as it would in liquidation." 7 Collier on Bankruptcy P 1129.02.

Here, that liquidation test is not satisfied. The Plan does not provide how much money WCP is to be paid, does not provide the interest rate that will be applied to payments, does not furnish any mechanism through which funds will be raised to make payments, and instead provides only vaguely for an auction, none of the details of which are disclosed. If an auctioneer takes even a 7% commission, WCP will receive less than it would in a chapter 7 liquidation. And if that auction is to be held five years henceforth (which the Plan makes woefully less-than-clear), WCP will still receive less than it would in a chapter 7 liquidation on a deferred basis.

The Debtor needs to show what WCP will be paid under the Plan, when WCP will be paid those monies, and what interest will accrue in the interim. Absent such, the Debtor cannot show that the net present value of what is being given to WCP exceeds what would be occasioned by a chapter 7 liquidation. And since the Plan is notably silent on these very critical data points, the Plan cannot be confirmed.

**g. The Plan is Not Fair and Equitable**

Since WCP is the sole member of Class 1, *see* Plan, DE #57, at § 3.2(a), and is voting to reject the Plan, the Debtor must show that the treatment of WCP is "fair and equitable," 11 U.S.C. § 1129(b)(1). No such showing can be made for myriad reasons.

As noted *supra*, the Plan, distilled to its core, is to have the Debtor's designee (or a relative thereof) continue to occupy the Property, rent-free, for some indefinite period of time, while WCP remains unpaid. The Plan does suggest regular payments might be made to WCP, but does not

specify the interest rate or amortization schedule, nor does the Plan indicate from where the funds for such payments will come.

Under the Bankruptcy Code, a finding of fairness and equitability turns, *inter alia*, on a showing:

> . . . that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. . .

11 U.S.C. § 1129(b)(2)(A)(i)(II). Yet the Plan contains no such allowance or assurance. Rather, as noted *supra*, § III(f), the Plan does not even comport with the liquidation test.

To be sure, this is not a technical or hypothetical concern. There is no more reason to believe the Property will go up in value than there is to believe the Property will go down in value. So any deferral of payment to WCP, of the full value of WCP's claim (which the Debtor acknowledges to be undersecured as of present), is to the economic detriment of WCP. Yes, the Debtor could make this up by paying interest during the life of the Plan. But, again, the Plan does not specify an interest rate or a mechanism for obtaining funds with which to make payments. And given that the current interest rate on WCP's note is 24%, it strains credulity to surmise the Debtor will be able to regularly make even interest-only payments when there is no offsetting stream of income.

## IV. Conclusion

At bottom, the portions of the Plan that contain sufficient detail are almost uniformly contra to the mandates of the Bankruptcy Code, while the portions of the plan devoid of such detail raise an equal number of impediments to confirmation. The Debtor is, rather clearly, trying to deed the Property in the name of the Debtor's principal, for purposes of traveling a perceptively-easier path to reorganization under Chapter 13. But the Debtor is a legal entity and legal entities are not

permitted entry into chapter 13, 11 U.S.C. § 109(e). So the Debtor has, instead, loitered in chapter 11, for a period of time now perilously close to 11 months, to the detriment of all creditors. And when pressed to file a plan, the Debtor produced something well short of what is required under governing law.

It is not lost on WCP that the Debtor has taken WCP's plan and used the tools of technology to replicate the same in an altered and edited form. Importantly, every single objection set forth herein is pegged to those alterations, edits and deletions. WCP, for rather evident reasons, does not take issue with the form of plan utilized by its counsel, nor with the allowances contemplated thereunder. But the Debtor's iteration is not nearly identical to WCP's and, as set forth *supra*, those fateful edits and alterations militate against confirmation.

WHEREFORE, WCP respectfully prays this Honorable Court (i) deny confirmation of the Plan; (ii) confirm, instead, the competing plan of WCP; and (iii) afford such other and further relief as may be just and proper.

Respectfully submitted,

Dated: January 22, 2025

By: /s/ Maurice B. VerStandig

Maurice B. VerStandig, Esq.
Bar No. 18071
The VerStandig Law Firm, LLC
1452 W. Horizon Ridge Pkwy, #665
Henderson, Nevada 89012
Phone: (301) 444-4600
Facsimile: (301) 444-4600
mac@mbvesq.com
*Counsel for WCP Fund I LLC*

*[Certificate of Service on Following Page]*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 22nd day of January, 2025, a copy of the foregoing was served electronically upon filing via the ECF system, with copies to:

- Nicole C. Kenworthy bdept@mrrlaw.net
- Lisa Yonka Stevens lisa.y.stevens@usdoj.gov
- US Trustee - Greenbelt USTPRegion04.GB.ECF@USDOJ.GOV
- Maurice Belmont VerStandig mac@mbvesq.com, lisa@mbvesq.com;mahlon@dcbankruptcy.com;mac@dcbankruptcy.com;verstandig.mauricer104982@notify.bestcase.com;verstandiglaw@recap.email
- Charles Earl Walton cwalton@cwaltonlaw.com, mhall@cwaltonlaw.com,cwaltonlaw@gmail.com;waltoncr91773@notify.bestcase.com,msolomon@cwaltonlaw.com

/s/ Maurice B. VerStandig
Maurice B. VerStandig